**UNITED STATES BANKRUPTCY COURT**      <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:                                       Chapter 11

AMR CORPORATION, *et al.*,          Case No. 11-15463 (SHL)

            Reorganized Debtors.      (Confirmed)

---------------------------------------------------------------x

JOHN KRAKOWSKI, KEVIN HORNER and
M. ALICIA SIKES,

               Plaintiffs,

         v.                            Adv. Pro. No. 16-01138 (SHL)

AMERICAN AIRLINES, INC., and ALLIED
PILOTS ASSOCIATION,

              Defendants.

---------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**JACOBSON PRESS & FIELDS P.C.**
*Counsel for John Krakowski, Kevin Horner and M. Alicia Sikes*
168 North Meramec Avenue, Suite 150
Clayton, Missouri 63105
By:    Allen P. Press, Esq.
        Lee Seham, Esq.

**O'MELVENY & MYERS LLP**
*Counsel for American Airlines, Inc.*
Times Square Tower
7 Times Square
New York, New York 10036
By:    Mark W. Robertson, Esq.
        Sloane Ackerman, Esq.

-and-

400 South Hope Street
Los Angeles, California 90071
By:    Robert A. Siegel, Esq.

**JAMES & HOFFMAN, P.C.**
*Counsel for Defendant Allied Pilots Association*
1130 Connecticut Avenue, NW, Suite 950
Washington, DC 20036
By:    Steven K. Hoffman, Esq.
       Darin M. Dalmat, Esq.
       Daniel M. Rosenthal, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the motions [ECF Nos. 14, 16][1] of the Defendants American

Airlines, Inc. ("American") and Allied Pilots Association ("APA") to dismiss the above-

captioned adversary proceeding.  Plaintiffs John Krakowski, Kevin Horner, and M. Alicia Sikes

are former Trans World Airlines ("TWA") pilots that are now employed by American.  *See*

Complaint to Vacate Arbitration Award ¶¶ 2-4 [ECF No. 1] (the "Complaint").  Defendant APA

is the union that represents American's pilots.  *See id.* ¶ 6.  The Plaintiffs seeks to vacate an

award in an interest arbitration conducted under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*

(the "RLA"), to determine certain contractual rights under the collective bargaining agreement

between American and APA.  The Plaintiffs allege that their due process rights to a fair

arbitration hearing were violated because of alleged bias on the part of the arbitrators.[2]

---

[1]    Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to the above-captioned adversary proceeding.

[2]    These parties have been engaged in extensive litigation over the years regarding this arbitration, a history that has been set forth in numerous prior decisions of this Court spread out over three cases.  *See Krakowski, et al. v. Am. Airlines, Inc., et al.*, Adversary Proceeding No. 13-01283 (SHL) ("*Krakowski I*"); *Krakowski, et al. v. Am. Airlines, Inc., et al.*, Adversary Proceeding No. 14-01920 (SHL) ("*Krakowski II*"); *Krakowski, et al. v. Am. Airlines, Inc., et al.*, Adversary Proceeding No. 16-01138 (SHL) ("*Krakowski III*"); *see also Krakowski v. Am. Airlines, Inc. (In re AMR Corp.)*, 2018 Bankr. LEXIS 1726 (Bankr. S.D.N.Y. June 12, 2018).; *Krakowski v. Am. Airlines, Inc. (In re AMR Corp.)*, 567 B.R. 247 (Bankr. S.D.N.Y. 2017); *Krakowski v. Am. Airlines, Inc. (In re AMR Corp.)*, 538 B.R. 213 (Bankr. S.D.N.Y. 2015); *Krakowski v. Am. Airlines, Inc. (In re AMR Corp.)*, 536 B.R. 360 (Bankr. S.D.N.Y. 2015); *Krakowski v. Am. Airlines, Inc. (In re AMR Corp.)*, 2015 Bankr. LEXIS 1721 (Bankr. S.D.N.Y. May 19, 2015); *Krakowski v. Am. Airlines, Inc. (In re AMR Corp.)*, 2014 LEXIS 2610 (Bankr. S.D.N.Y. June 3, 2014).  Mindful that this case—*Krakowski III*—is the last of the three related cases filed by the Plaintiffs, the Court did not issue a decision on the Defendants' current motions to dismiss this adversary proceeding until the Court had ruled upon all previously filed motions in the related cases of *Krakowski I* and *Krakowski II*.

The Defendants seek dismissal of the Complaint under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6), asserting that the Plaintiffs lack standing to vacate the arbitration award,

the action is time-barred under the RLA and the Plaintiffs have failed to state a claim for which

relief can be granted.  For the reasons set forth below, the Court grants the motions to dismiss

based on the Plaintiffs' lack of standing and because the case is time-barred.

## BACKGROUND

In November 2011, American filed for protection under Chapter 11 of the Bankruptcy

Code.  *See* Compl. ¶ 15.  As part of its reorganization, American sought and obtained approval

under Section 1113 of the Bankruptcy Code to abrogate its then-existing collective bargaining

agreement with APA (the "Old CBA").  *See id.* ¶ 20; *see also In re AMR Corp.*, 477 B.R. 384,

454 (Bankr. S.D.N.Y. 2012); *In re AMR Corp.*, 478 B.R. 599, 602 (Bankr. S.D.N.Y. 2012).  The

Old CBA included a supplement, entitled Supplement CC, which modified American's pilot

seniority list to incorporate former TWA pilots—including the Plaintiffs—that were brought into

the company when American acquired the assets of TWA in 2001.  *See* Compl. ¶¶ 9-10.

Supplement CC stripped the former TWA pilots of much of the existing seniority that they had

held at TWA.  *See id.* ¶¶ 11-12.  To compensate for the loss of seniority, Supplement CC created

a "protective fence" that set aside a minimum number of Captain and First Officer positions at

the St. Louis base, for which former TWA pilots were given preferential bidding.  *See id.* ¶ 13.

The Old CBA—including Supplement CC—was abrogated when the Debtors obtained the

Section 1113 relief in September 2012.  *See id.* ¶ 20.

In December 2012, American and APA came to an agreement on a new pilot collective

bargaining agreement (the "New CBA"), which included a side letter of agreement numbered 12-

05 ("LOA 12-05").  *See id.*  ¶¶ 21-22.  During the process of negotiating the New CBA,

3

American represented that it intended to close the St. Louis base and eliminate the protective

fence that had existed for the former TWA pilots.  *See id.* ¶ 16.   LOA 12-05 stated that "a

dispute resolution procedure is necessary to determine what alternative contractual rights should

be provided to TWA Pilots as a result of the loss of flying opportunities due to termination of

Supplement CC and the closing of the STL base."  LOA 12-05 at 1 (attached as Ex. 1 to APA

Mem. in Supp. of Mot. to Dismiss [ECF No. 14-3]); *see also* Compl. ¶ 22.  Regarding the

process, LOA 12-05 provided that "the Company and APA will engage in final and binding

interest arbitration pursuant to Section 7 of the [Railway Labor Act]" in front of a panel

"consist[ing] of three neutral arbitrators who are members of the National Academy of

Arbitrators with Richard Bloch as the principal neutral."  LOA 12-05 at 1-2; *see also* Compl. ¶

24.

In January 2013, American and APA entered into a protocol agreement regarding the

arbitration (the "Protocol Agreement").  *See* Compl. ¶ 31.  The Protocol Agreement stated that

the arbitration would "provide for party status at the hearings and for substantive presentations

by: (1) American Airlines, Inc.; (2) a representative committee of AA Pilots . . . and (3) a

representative committee of TWA Pilots. . . .  APA participation as a party . . . shall not be for

the purposes of advocating a substantive position but to facilitate an orderly process and

resolution of the dispute."  Protocol Agmt. § 1 (attached as Ex. 2 to APA Mem. in Supp. of Mot.

to Dismiss [ECF No. 14-4]).[3]  It further provided that "[w]hile party status for purposes of the

---

[3]    While LOA 12-05 and the Protocol Agreement are not attached to the Complaint, they are referenced in the
Complaint and are integral to its allegations.  *See* Compl. ¶¶ 22, 31-34, 66-71.  Thus, these documents may properly
be considered when deciding these motions to dismiss.  "[A] complaint is deemed to include any written instrument
attached to it as an exhibit or any statement or documents incorporated in it by reference.  Moreover, when a
plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies
and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding
the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."  *Int'l
Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (internal citations and quotations omitted);
*see also Stratte-Mcclure v. Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).  All parties seem to concede as much given that

Board's hearing proceedings shall be as specified in Section 1 of the Agreement, the 'parties' as to this Agreement and as used in the applicable Railway Labor Act provisions, shall be limited to AA and APA." Protocol Agmt. § 7. While the only parties to the arbitration were American and APA, APA established two committees to present evidence and arguments on its behalf: the APA AA Pilots Committee and the APA TWA Pilots Committee. *See* Compl. ¶ 38.

The Protocol Agreement also designated the members of the arbitration panel as Arbitrator Bloch—previously named under LOA 12-05—and Arbitrators Stephen Goldberg and Ira Jaffe. *See* Protocol Agmt. § 2; Compl. ¶¶ 25, 30. Arbitrator Goldberg is the president and founder of Mediation Research & Education Project, Inc. ("MREP"), an arbitration and mediation service focusing on labor/management disputes that serves as a referral service for its more than 60 members. *See* Compl. ¶¶ 26-27. MREP is a non-profit, but does receive fees for its services, as well as member contributions. *See id.* With respect to *ex parte* contacts, the Protocol Agreement specified that "[t]he Board may conduct informal *ex parte* discussions to the extent it deems such discussions useful in an attempt to obtain a voluntary resolution of the dispute." Protocol Agmt. § 4; *see also* Compl. ¶ 33.

The Protocol Agreement explicitly incorporated Sections 7, Third and Section 8 of the RLA. *See* Protocol Agmt. § 7. As to the finality of any award issued by the arbitrators, the Protocol Agreement provided that "[n]othing in this Agreement should be construed to require AA or APA to file a copy of the Board's award with a federal district court in order for the award

---

their papers make repeated references to these documents. *See* APA Mem. in Supp. of Mot. to Dismiss [ECF No. 14-2] at 1-2, 5, 9, 13, 15, 18, 21-23; Am. Mem. in Supp. of Mot. to Dismiss [ECF No. 16] at 1, 3, 8-9, 12-14; Pls.' Combined Resp. to Defs.' Mot. to Dismiss (the "Plaintiffs' Response") [ECF No. 19] at 2, 4-5; Am. Reply Mem. in Supp. of Mot. to Dismiss [ECF No. 20] at 1, 3, 8, 10; APA Reply Br. in Supp. of Mot. to Dismiss [ECF No. 21] at 9, 14.

to be final and binding. . . . The award shall be final and binding under Section 9 of the Railway

Labor Act." Protocol Agmt. §§ 7-8.

The parties submitted their opening arbitration briefs in April 2013, and the arbitrators

held seven days of hearings from April through June 2013. *See* Compl. ¶¶ 39-40. One of

American's principal witnesses during the arbitration was Mark Burdette. *See id.* ¶¶ 29, 42. The

arbitrators issued their opinion in July 2013, which the Plaintiffs assert most closely replicated

American's proposal. *See id.* ¶ 43. American and APA then negotiated contract language based

on the arbitrators' opinion. *See id.* ¶ 44. Mr. Burdette was one of America's principal

negotiators during this process. *See id.* Issues arose during the drafting of the contract language,

and on September 12, 2013 the arbitrators issued a "Ruling on Contract Language." *Id.* ¶ 45. A

corresponding supplement to the new CBA, entitled Supplement C, was then approved. *See id.*

It subsequently came to light that Mr. Burdette and Arbitrator Goldberg communicated

by email on an *ex parte* basis during the arbitration process. *See id.* ¶¶ 47-48. These

communications included, among other things, congratulations shared between the two upon

Arbitrator Goldberg's appointment to the panel,[4] discussions regarding Mr. Burdette becoming a

---

[4]      On January 10, 2013, Mr. Burdette emailed Arbitrator Goldberg to congratulate him on being appointed to
the arbitration panel. *See* Compl. ¶ 48. Mr. Burdette also informed Arbitrator Goldberg of his likely involvement in
the arbitration proceedings. *See id.* Arbitrator Goldberg replied, "Thx for the note, but I'd rather see you there as a
member of the arbitration panel than as a witness. One of these days. . . ." *Id.*

member of MREP,[5] and Mr. Burdette's subsequent MREP membership.[6]  *See id.* ¶¶ 47-53.  After

the arbitrators issued their decision in the arbitration, Mr. Burdette also shared a mock award

with Arbitrator Goldberg that Mr. Burdette had drafted with respect to the LOA 12-05

arbitration.[7]  *See id.* ¶ 54.  Arbitrator Goldberg did not disclose these communications to the

parties, nor did he share the fact that Mr. Burdette had become a member of MREP.  *See id*. ¶¶

48, 50, 57.

It also came to light that Arbitrator Bloch had *ex parte* communications with Thomas

Reinert, American's counsel in the arbitration, during which Arbitrator Bloch proposed a

possible settlement of the arbitration and asked Mr. Reinert to pass the proposal along to APA.

*See id.*  ¶¶ 58, 59.[8]

---

[5]    On March 21, 2013, Arbitrator Goldberg and Mr. Burdette exchanged additional emails.  *See* Compl. ¶ 49.
Among other things, Mr. Burdette asked Arbitrator Goldberg, "You mentioned sometime back about training me
and putting me on the MREP panel. Is that still a possibility?"  *Id.*  Arbitrator Goldberg and Mr. Burdette then
discussed the logistics of Mr. Burdette receiving MREP training from Arbitrator Goldberg in Chicago.  *See id.*  Mr.
Burdette subsequently became a MREP member and attended training in Chicago.  *See id.* ¶ 51.

During the March 21, 2013 email exchange, Arbitrator Goldberg and Mr. Burdette also discussed Edgar
James, APA's attorney.  *See id.* ¶ 50.  Mr. Burdette commented that, "I think Ed James would gladly recommend
you [for mediation work] to Paul Jones [a lawyer for U.S. Airways]," to which Arbitrator Goldberg responded, "By
the way, I know that Ed [James] is a great fan of yours...He told me he thought you should be Senior V-P, HR (to
which I wholeheartedly agreed)."  *Id.*

[6]    On July 12, 2013, Mr. Burdette emailed Arbitrator Goldberg stating, among other things, "I will be sending
a voluntary contribution to MREP as suggested in the annual report."  Compl. ¶ 52.  Arbitrator Goldberg responded,
"A contribution would be appreciated, but maybe you had better wait until you have some income!"  *Id.*

[7]    During the July 12, 2013 email exchange, Mr. Burdette stated that he had prepared a mock award that he
would share with Arbitrator Goldberg after the release of the arbitrator's opinion.  *See* Compl. ¶ 53.  On July 22,
2013—the day the arbitrators issued the initial opinion—Mr. Burdette emailed his mock award to Arbitrator
Goldberg subsequent to the arbitrators issuing their opinion.  *See id.* ¶ 54.  On July 23, 2013, Arbitrator Goldberg
responded, "Looks to me like you're as good an arbitrator as we are...maybe better!"  *Id.*  Arbitrator Goldberg also
explained his reasoning on one of the key points in the arbitration opinion, marking this paragraph of his email with
"[CONFIDENTIAL]" at the beginning and "[CONFIDENTIAL: WHAT IS IN THIS PARAGRAPH IS FOR
YOUR EYES ONLY.]" at the end.  *Id.*  Mr. Burdette responded, "Understood about confidentiality. Appreciate your
sharing the logic, but it goes no further."  *Id.*

[8]    On May 17, 2013, Mr. Reinert emailed Arbitrator Bloch, asking Arbitrator Bloch to contact him.  *See*
Compl. ¶ 59.  A telephone call subsequently took place, following up on the settlement proposal.  *See id.*

The Plaintiffs assert that they were denied their due process rights to a fair hearing because one or more of the arbitrators violated the Protocol Agreement and displayed bias or hostility towards one of the parties.  *See id.* ¶¶ 60-61.  Citing to the communications and business relationship between Arbitrator Goldberg and Mr. Burdette, the Plaintiffs contend that there was a conflict of interest between Arbitrator Goldberg and Mr. Burdette or that a reasonable person would believe that such a conflict of interest existed.  *See id.* ¶¶ 61-65.  Thus, the Plaintiffs contend that Arbitrator Goldberg was impermissibly biased in favor of Mr. Burdette during the proceeding.  *See id.*  The Plaintiffs also argue that the Protocol Agreement was violated because Arbitrator Goldberg and Arbitrator Bloch conducted *ex parte* communications that were outside the scope of what was permitted under the agreement.  *See id.* ¶¶ 66-71.  The Defendants counter that the Plaintiffs lack standing to challenge an arbitration proceeding in which only the union and employer were parties, and that the Complaint is time-barred because the applicable statute of limitations under the RLA has run.  The Defendants also contend that the Plaintiffs allegations in the Complaint are insufficient to state a claim because the Plaintiffs fail to satisfy the high standard for improper conduct that is necessary to overturn an arbitrator's award.

## DISCUSSION

### A.  The Plaintiffs Lack Standing to Challenge the Arbitration Award

The Defendants ask that the Complaint be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  They argue that these individual Plaintiffs lack standing to challenge the LOA 12-05 arbitration award because the Plaintiffs were not parties to the arbitration.  The Plaintiffs maintain that the RLA provides them with standing to challenge the award.

Federal Rule of Civil Procedure 12(b)(1), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7012(b), provides for dismissal for lack of subject matter jurisdiction, including a lack of standing.  *See* Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b); *Tasini v. N.Y. Times*, 184 F. Supp. 2d 350, 354 (S.D.N.Y. 2000); *see, e.g., Fletcher v. Convergex Grp.*, 164 F. Supp. 3d 588, 590 (S.D.N.Y. 2016).  As the party seeking to invoke the jurisdiction of the court, the plaintiff bears the burden of establishing subject matter jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Dismissal of a claim for lack of subject matter jurisdiction is appropriate when the "court lacks the statutory or constitutional power to adjudicate it."  *Id.*  "When considering a motion to dismiss for lack of subject matter jurisdiction . . . a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).  In addition, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional question."  *Margiotta v. Kaye*, 283 F. Supp. 2d 857, 861 (E.D.N.Y. 2003).

The LOA 12-05 arbitration here was an "interest" arbitration, conducted pursuant to the rules and procedures laid out in Section 7 of the RLA, 45 U.S.C. § 157.  *See* LOA 12-05 at 1 ("[T]he Company and APA will engage in final and binding interest arbitration pursuant to Section 7 of the RLA. . . .").  While Section 9 of the RLA authorizes challenges to arbitration awards entered pursuant to Section 7, neither Section 7 nor Section 9 speak to the issue of standing to challenge such awards.  *See generally* 45 U.S.C. §§ 157, 159; *see also* Pls.' Resp. at 6-7.  But it is well established in this Circuit that "an individual employee represented by a union [in a labor arbitration] generally does not have standing to challenge an arbitration proceeding to which the union and the employer were the only parties."  *Katir v. Columbia Univ.*, 15 F.3d 23, 24-25 (2d Cir. 1994); *see also Shait v. Millennium Broadway Hotel*, 2001 U.S. Dist. LEXIS

9

6575, at *27 (S.D.N.Y. May 18, 2001); *Duffy v. Legal Aid Soc'y*, 2013 U.S. Dist. LEXIS 19456,

at *6-7 (S.D.N.Y. Feb. 12, 2013); *Johnson v. Am. Arbitration Ass'n*, 1999 U.S. Dist. LEXIS

5319, at *8 (S.D.N.Y. Apr. 15, 1999); *Smith v. Wilson*, 1997 U.S. Dist. LEXIS, at *9-10

(S.D.N.Y. Dec. 23, 1997); *U.S. Postal Serv. v. Am. Postal Workers Union*, 564 F. Supp. 545, 550

(S.D.N.Y. 1983).[9]  This rule is meant to "effectuate the purposes behind federal labor statutes,

which require that the interests of particular individuals be subordinated to the interests of the

group at the contract-negotiation stage and beyond."  *Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d

225, 232 (5th Cir. 2007).  The remedy for an individual is to instead pursue a duty of fair

representation claim against his or her union, should grounds exist to do so.  *See Katir*, 15 F.3d at

24-25; *see also Mitchell*, 481 F.3d at 232.

The Court finds that the Plaintiffs' action is foreclosed under this rationale.  The

Plaintiffs acknowledge that the parties to the arbitration were American and APA, and that APA

established two committees—an AA Pilots Committee and a TWA Pilots Committee—to present

evidence and arguments during the arbitration.  *See* Compl. ¶ 38; *see also* Protocol Agmt. §§ 1,

7; LOA 12-05 at 1.  The Plaintiffs were not parties to the arbitration but were instead represented

by APA prior to the arbitration and by the TWA Pilots Committee during the arbitration.

The Plaintiffs argue that the RLA nonetheless grants them standing to challenge the LOA

12-05 arbitration award.  The Plaintiffs assert that they have standing under Section 3 of the

RLA, 45 U.S.C. § 153.  *See* Pls.' Resp. at 6-7.  Section 3 provides, in part:

---

[9]      The Plaintiffs attempt to distinguish the cases cited above by the Defendants by arguing that many were
decided under the Federal Arbitration Act or the Labor Management Relations Act, not the RLA.  But this
distinction has been rejected by other courts as meaningless.  While there is not much case law on this issue in the
context of the RLA, the Court of Appeals for the Fifth Circuit labeled this exact argument to be "a distinction
without a difference," noting that whatever statute the CBA in question was established under, "its existence is
premised on effectuating a key purpose behind federal labor statutes, viz., placing the interests of the group ahead of
the interests of the individual employees."  *Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d 225, 233 (5th Cir. 2007).  The
Court finds the reasoning of these cases persuasive in light of the facts and public policy implications of this case,
which are further discussed below.

> [i]f an employee or *group of employees*, or any carrier, is aggrieved by the failure
> of any division of the Adjustment Board to make an award in a dispute referred it,
> or *is aggrieved by any of the terms of an award* or by the failure of the division to
> include certain terms in such award, then such employee or *group of employees* or
> carrier may file in any United States district court . . . a petition for review of the
> division's order.

45 U.S.C. § 153, First (q) (emphasis added).  The Plaintiffs contend that they are a "group of

employees" that "is aggrieved by . . . the terms of an award," and they claim standing under

Section 3.  Pls.' Resp. at 6.

But the fit is a poor one.  Section 3 addresses challenges to "grievance" arbitration

awards, not awards issued in "interest" arbitrations conducted under Section 7 of the RLA.  *See*

45 U.S.C. § 153, First (i) (disputes "growing out of grievances or out of the interpretation or

application of agreements concerning rates of pay, rules, or working conditions . . . may be

referred . . . to the appropriate division of the Adjustment Board. . . ."); *In re Central R.R. Co.*,

425 F. Supp. 1055, 1066 (D.N.J. 1976); The Railway Labor Act, Ch. 6.II.E.1 (Chris A.

Hollinger, ed., 3d ed. 2012) (interest arbitration procedures are governed by Sections 7, 8 and 9

of the RLA).

Interest and grievance arbitrations serve two distinct purposes.  Interest arbitration is used

to resolve an impasse between parties during bargaining over the formation of a collective

bargaining agreement or certain specific contractual terms.  In these circumstances, an arbitrator

settles the differences between the parties that have led to the breakdown in negotiations.  *See*

*The Difference Between Grievance and Interest Arbitration*, Law. Missouri.edu (Jan. 24, 2019),

http://law.missouri.edu/arbitrationinfo/2016/01/07/the-difference-between-grievance-and-

interest-arbitration/.  Thus, "[i]nterest arbitration, in effect, is a way to form a contract, either in

whole, or in part."  Barry Winograd, *An Introduction to the History of Interest Arbitration in the*

*United States*, 61 LABOR LAW J., 164, 165 (2010).  In contrast, a grievance arbitration is a

method of deciding disputes regarding the interpretation and application of the terms of a

collective bargaining agreement that is already in place.  *See id.*; *see also* David S. Dederick,

*CHAPTER: Labor Law*, 55 GEO. WASH. L. REV. 1012, 1044 n.236 (1987) ("Arbitration of

bargaining impasses is generally known as 'interest arbitration,' to distinguish it from arbitration

concerning grievances and contract interpretations.").  Thus, an interest arbitration is used to

establish the terms of a CBA, while a grievance arbitration addresses whether there has been a

violation of a CBA or how a CBA should be interpreted.  *See* Hr'g Tr. 9:5-11 (July 31, 2018)

[ECF No. 28].  Upon its creation, the RLA "sharply distinguished between interest and grievance

disputes and established separate procedures for their resolution."  Dennis R. Nolan and Roger I.

Abrams, *American Labor Arbitration: The Early Years*, 35 U. FLA. L. REV. 373, 386 (1983).

The Plaintiffs cite to no authority—and the Court has been unable to locate any—in

which a court has used Section 3 to grant individual employees standing to challenge the results

of an interest arbitration.  The Plaintiffs cite to *Bhd. of Locomotive Eng'rs v. Atchison, Topeka &

Santa Fe Ry. Co.*, 768 F.2d 914 (7th Cir. 1985) to support their argument that Section 3 is

applicable to interest arbitrations.  But that case is distinguishable.  In *Atchison*, the Court of

Appeals for the Seventh Circuit held that the judicial standard of review that was contained in

Section 3, First (q) of the RLA—which normally governs arbitration decisions by the National

Railroad Adjustment Board—should also apply to awards made by Public Law Boards.  *See*

*Atchison*, 768 F.2d at 921; 45 U.S.C. § 153, First (q).  The RLA was silent as to the standard of

review for awards issued by the Public Law Boards and the Court of Appeals acknowledged that

courts had assumed the standard of review was the same for both types of awards, noting that

"this must be right" because "[t]he Public Law Boards are intended to be substitutes for the

chronically overworked National Railroad Adjustment Board."  *Id.*

12

But the Public Law Board and the National Railroad Adjustment Board both exist to conduct grievance arbitrations.  *See* Nolan & Abrams, *American Labor Arbitration: The Early Years*, 35 U. Fla. L. Rev. at 387; *Elgin, J. & E. R. Co. v. Burley*, 325 U.S. 711, 726-27 (1945); *United Transp. Union v. Norfolk & W. R. Co.*, 754 F.2d 525, 526 (4th Cir. 1985).[10]  Thus, the reasoning in *Atchison* does not provide this Court with any support for applying the procedures for grievance arbitrations to interest arbitrations.[11]  Unlike the two types of boards addressed in *Atchison*, grievance and interest arbitrations are clearly not mere "substitutes" for one another. The distinction between the two types of arbitration is clear from the differing rules that Congress enacted regarding challenges to grievance and interest arbitrations.  For instance, Congress has established a much shorter statute of limitations for challenges to interest arbitrations.  *Compare* 45 U.S.C. § 153, First (q) (establishing a two-year period for challenging grievance arbitration awards), *with* 45 U.S.C. § 159, Second (establishing 10-day period for challenging interest arbitration awards).  The shorter limitations period clearly reflects Congress's desire to "ensure the speedy and conclusive settlement of disputes" in the context of interest arbitrations.  *Catalano v. Brotherhood of Ry., Airline & S.S. Clerks*, 348 F. Supp. 369,

---

[10]    As one commentator explained the history:

> The 1934 amendments addressed these grievance resolution problems by establishing a single organization, the National Railroad Adjustment Board (NRAB), to settle grievances.  Today the NRAB functions in four divisions, each composed of representatives from management and labor. Grievances can also be resolved outside the NRAB framework.  Individual carriers and unions have established various special adjustment boards and supplemental adjustment boards to lighten the caseload in a NRAB division.  In addition, amendments to the law in 1966 authorized establishing 'public law boards' to further reduce backlog in the NRAB.  Public law boards could be created on request of either railroads or unions to resolve disputes otherwise referable to the NRAB.

Nolan & Abrams, *American Labor Arbitration: The Early Years*, 35 U. Fla. L. Rev. at 387.

[11]    No claims in *Atchison* were made under Section 7 of the RLA.  The only two counts at issue in *Atchison* were: (1) an alleged violation of Section 2, First of the RLA, imposing a duty to bargain in good faith, and Section 6, requiring advance notice of unilateral change in working conditions; and (2) a claim under Section 3, First (q) of the RLA.  *See Atchison*, 768 F.2d at 918.

371 (S.D.N.Y. 1972) (discussing the 10-day statute of limitations period under Section 9 of the RLA and noting that general equity principles "must be subordinated to the congressional intent expressed in the language of the statutes governing arbitration procedures.").

Given the RLA's silence regarding individual standing in Sections 7 and 9 and the congressional concern with finality in interest arbitrations, the Court believes that the default principle should apply in this case: that "an individual employee represented by a union generally does not have standing to challenge an arbitration proceeding to which the union and the employer were the only parties." *Katir*, 15 F.3d at 24-25.  To hold otherwise would open the doors to substantial post-award litigation by a single dissatisfied employee within a bargaining unit, thereby destabilizing a process meant to create a labor contract that governs the interests of all employees within the unit.  As a practical example, the facts of this case involve three individuals challenging the arbitration process that created a contract which governs the seniority rights of over 13,000 American pilots.  *See* Hr'g Tr. 9:12-20 (July 31, 2018) (counsel for American noting that "you have decisions that impact the entire bargaining unit.  And here is a perfect example where you have a decision addressing seniority that impacts the rights of all 13,000 pilots at American.  And the arbitration process itself is structured to collectively address the interests of all those pilots . . . beyond these individuals in exemplifying why individual pilots are not permitted to challenge such awards.").  Allowing an individual that has not been designated as a group representative to seek to undo the work that has been achieved by the union, the actual employee representative, through interest arbitration would only serve to undermine the system of collective dispute resolution.  Such individuals are not left without

recourse; to the extent that their employee representatives in the APA union have acted improperly, individuals may pursue a duty of fair representation claim.[12]

But even if this Court were to hold that Section 3, First (q) were applicable to interest arbitration awards, the Plaintiffs here would still lack standing.  Even Section 3 does not provide standing to individual employees when an arbitration involves the interests of a group of employees rather than the separate interests of the individuals.  The Fifth Circuit Court of Appeals has twice held that even in the context of a grievance arbitration—where Section 3, First (q) is clearly applicable—an individual employee will not have standing when a union is pursuing an arbitration on behalf of all members and the dispute did not involve grievances specific only to those individuals.  *See Mitchell*, 481 F.3d at 228-29, 232-33; *Mackenzie v. Air Line Pilots Ass'n, Int'l*, 598 F. App'x 223, 225-26, 226 n.4 (5th Cir. 2014).  Both decisions rejected the argument that Section 3, First (q) provided the individual employees in those cases with standing.  *See Mitchell*, 481 F.3d at 233 n.24; *Mackenzie*, 598 F. App'x at 226 n.4.  Instead the Fifth Circuit focused on the federal labor policies favoring collective resolution of disputes, noting that

> [i]f an employee could compel arbitration of a grievance without his union's blessings, a CBA's contractual conflict-resolution procedures would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.  The same can be said of an employee's ability to seek judicial review of an arbitral award, after being abandoned by his union.

---

[12] The Court has already addressed a duty of fair representation claim brought by these Plaintiffs as to other allegations relating to this arbitration.  *See generally Krakowski v. Am. Airlines, Inc. (In re AMR Corp.)*, 2018 Bankr. LEXIS 1726.

*Mitchell*, 481 F.3d at 232-33 (internal citations and quotations omitted); *see also Mackenzie*, 598 F. App'x at 226.[13]

The same policy concerns identified by the Fifth Circuit apply in full force to the LOA 12-05 arbitration here. The Plaintiffs were not parties to the Protocol Agreement or the arbitration itself. They were instead represented by APA and the TWA Pilots Committee during the negotiation of the arbitration terms and the arbitration proceedings.[14] The Plaintiffs now sue in their individual capacity to overturn the results of an arbitration that reconciled the interests of thousands of American pilots besides themselves. In fact, the TWA Pilots Committee—which represented the entire group of TWA pilots during the arbitration and would have a much stronger argument regarding standing—did not sue to overturn the results of this arbitration. To now allow these three individual Plaintiffs to undo the process—absent a failure of adequate representation—would inject an unacceptable level of uncertainty into the collective system of conflict resolution, impacting the thousands of employees within the bargaining unit. Doing so would clearly contradict the congressional intent "behind federal labor statutes, which require the interests of particular individuals be subordinated to the interest of the group at the contract-negotiation state and beyond." *Mitchell*, 481 F.3d at 232.

---

[13]    The Plaintiffs argue that *Mitchell* and *Mackenzie* are inapplicable because the CBAs in those cases gave the unions "the exclusive right to pursue claims" and therefore limited the standing of parties in those circumstances. Pls.' Resp. at 10. But in both cases, the applicable CBAs gave the unions the exclusive right to pursue claims in the grievance arbitration process—not other types of claims. *See Mitchell*, 481 F.3d at 234; *Mackenzie*, 598 F. App'x at 226. The Court of Appeals found that the union's exclusive right to pursue grievance arbitration necessarily implied an exclusive right to vacate the resulting awards. They stated that "it would be paradoxical in the extreme if a union that is vested with the exclusive authority to bring an employment grievance and pursue it up to and through binding arbitration were not likewise vested with the exclusive responsibility to instigate and prosecute a review of an arbitral award in court." *Mitchell*, 481 F.3d at 233. LOA 12-05 and the Protocol Agreement similarly designated American and APA as the sole parties to the arbitration, with the contract language here being almost identical to the language contained in *Mackenzie*. *See Mackenzie*, 598 F. App'x at 226 ("Letter 3 specifically names American, Eagle, APA, and ALPA as the parties to the dispute resolution procedures.").

[14]    This Court has previously discussed APA's use of the TWA and AA pilot committees as a way to address that these two pilot groups had competing interests in the outcome of this arbitration. *See Krakowski*, 2018 Bankr. LEXIS 1726, at *36-40; *cf., Krakowski*, 2014 Bankr. LEXIS 2610, at *14-15.

The Plaintiffs erroneously rely on *McQuestion v. New Jersey Rail Operations*, 892 F.2d

352 (3d Cir. 1990), to argue that non-parties to labor arbitrations conducted under the RLA have

standing to dispute the resulting awards.  In *McQuestion*, two individuals challenged their

termination through the in-house appeals procedures of their employer, New Jersey Transit.  *See

id.* at 353.  When those challenges failed, the union filed petitions with the National Railroad

Adjustment Board on behalf of the individuals, seeking to have the discharges set aside.  *See id.*

While the petitions were signed only by a union representative, each petition indicated that it was

submitted on behalf of the individuals.  *See id.*  In addition, the individuals were present at the

hearing held by the adjustment board, which dealt only with their individual grievances.  *See id.*

The Third Circuit ultimately held that the individuals had standing under Section 3, First (q) to

challenge the order of the adjustment board.  *See id.* at 354.   The Court noted that the language

of Section 3, First (q) cited to  "any employee . . . aggrieved" by a ruling and authorizes "such

employee" to file a petition for review and that "confining ourselves to the literal wording of the

statute, the appellants did have standing to seek review. . . ."  *Id.* at 354.  The Court of Appeals

concluded that "[t]he proceedings before the Board were conducted *solely* to resolve appellants'

uniquely individual grievances. . . . Indeed, the district court observed that appellants were the

real parties in interest."  *Id.* (emphasis added) (internal citations and quotations omitted).

Thus, *McQuestion* is both legally and factually inapposite for two reasons.  First,

*McQuestion* involved an adjustment board proceeding that dealt only with the rights of the two

individuals seeking to challenge a decision relating to their termination, while the case before

this Court involves three individuals challenging a decision that impacts the collective

contractual rights of thousands of employees.  As the LOA 12-05 arbitration award does not

involve "uniquely individual grievances," the reasoning of *McQuestion* is inapplicable to this

17

case.  Second, *McQuestion* involved grievance arbitration and was interpreting Section 3, First

(q), which this Court has already ruled does not apply to this interest arbitration.  Indeed, the

*McQuestion* court distinguished its ruling from another case that involved a group of employees

who were found to lack standing to vacate an arbitration award relating to CBA terms for an

entire employee group.  *See id.* (citing *Anderson v. Norfolk & W. Ry. Co.*, 773 F.2d 880 (7th Cir.

1985)).

### B.    <u>The Plaintiffs' Claim is Untimely</u>

The Court also concludes that the Complaint should be dismissed as untimely because it

was filed after the expiration of the statute of limitations.  "Although the statute of limitations is

ordinarily an affirmative defense that must be raised in the answer, a statute of limitations

defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the

complaint."  *Ellul v. Congregation of Christian Bros.,* 774 F.3d 791, 798 n.12 (2d Cir. 2014).

Federal Rule of Civil Procedure 12(b)(6), made applicable by Bankruptcy Rule 7012, provides

that a complaint must be dismissed if it fails to state a claim upon which relief can be granted.  In

analyzing a motion to dismiss under Rule 12(b)(6), a court looks to whether a plaintiff has

pleaded "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007).  The court must determine "whether the well-pleaded

factual allegations, assumed to be true, plausibly give rise to an entitlement to relief."  *Hayden v.

Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)).

A court must proceed "on the assumption that all the allegations in the complaint are true."

*Twombly*, 550 U.S. at 555.  The court must also draw all reasonable inferences in favor of the

non-moving party.  *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000).

Section 9 of the RLA provides a 10-day statute of limitations for actions to vacate an interest arbitration award, stating that "[a]n award . . . shall be conclusive on the parties as to the merits and facts of the controversy submitted to arbitration, and unless, within ten days after the filing of the award, a petition to impeach the award . . . shall be filed . . . the court shall enter judgment on the award, which judgment shall be final and conclusive on the parties." *See* 45 U.S.C. § 159, Second.  The LOA 12-05 arbitration award was issued on July 22, 2013, and the arbitrators' ruling on contract language followed on September 12, 2013.  Compl. ¶¶ 43, 45.  The Plaintiffs filed the Complaint on June 27, 2016, almost three years after the arbitration rulings were issued.  *See* ECF No. 1.

The Plaintiffs concede that the 10-day statute of limitations applies to their claims.  *See* Pls.' Resp. at 11.  But they argue that limitations period should be equitably tolled until June 15, 2016,[15] the date on which they took Mr. Burdette's deposition.[16]  The Plaintiffs assert that they could not have known the facts necessary to bring their claim until that deposition took place.  Citing to *Holmberg v. Armbrecht*, 327 U.S. 392 (1946), the Plaintiffs argue that equitable tolling applies to the RLA because "[t]his equitable doctrine is read into every federal statute of limitation."  *Id.* at 397 (stating that "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."); *but see Iavorski v. United States INS*, 232 F.3d 124, 129 (2d Cir. 2000) (noting that "[a]

---

[15]    Assuming that Mr. Burdette's deposition is the event triggering the start of the statute of limitations, the tenth day following the June 15, 2016 deposition of Mr. Burdette fell on a Saturday.  Because of this, the applicable time period would continue to run until the end of the following Monday, which was June 27, 2016.  This is the date on which the Plaintiffs filed the Complaint.  *See* Fed. R. Bankr. P. 9006(a)(1)(C); Fed. R. Civ. P. 6(a)(1)(C).

[16]    The Burdette-Goldberg emails were produced—and Mr. Burdette's deposition was conducted—in *Krakowski I*, a related adversary proceeding brought by the Plaintiffs against the Defendants.

statute of limitations may be tolled as necessary to avoid inequitable circumstances" and that "[n]ot all time limitations are subject to equitable tolling.  If Congress enacts a jurisdictional bar to untimely claims, equitable tolling will not apply.  If the time limit is contained in an ordinary statute of limitations, however, it is assumed that it is subject to equitable tolling.  The basic question to be answered in determining whether . . . a statute of limitations is to be tolled, is one of legislative intent.") (internal citations and quotations omitted).[17]

The Plaintiffs' position on tolling is incorrect as a matter of law and fact.  To begin with, case law in this jurisdiction prohibits equitable tolling of the 10-day statute of limitations for seeking to vacate an arbitration award under Section 9 of the RLA, 45 U.S.C. § 159, Second.[18] In *Catalano v. Brotherhood of Ry. Airline & S.S. Clerks, Fright Handlers, Express & Station Emps.*, 348 F. Supp. 369 (S.D.N.Y. 1972), several employees brought an action challenging an arbitration award issued under the RLA, alleging fraud on the part of the arbitrators.  *See id.* at 370-71.  The respondent argued that the action was barred by the 10-day statute of limitations in Section 9 of the RLA, but the employees asserted the claim was timely because the action did not accrue until the arbitrators' alleged fraud was actually discovered.  *See id.* at 371.  Like the

---

[17]    While the Plaintiffs cite to *Iavorski* to support their argument that equitable tolling is applicable to all federal statutes, the Second Circuit in *Iavorski* instructs a court to look to the legislative intent of the statue to determine whether it is subject to tolling.  *See Iavorski*, 232 F.3d at 129.  The Plaintiffs have provided no argument regarding the legislative intent of the RLA on this point.

[18]    The Plaintiffs cite to several cases which they argue "consider equitable tolling in RLA cases."  Pls.' Resp. at 12 n.5.  But the Plaintiffs fail to mention that each of these cases ultimately rejects equitable tolling of the applicable statute of limitations.  *See Bhd. of Locomotive Eng'rs v. CSX Transp., Inc.*, 522 F.3d 1190, 1198-1199 (11th Cir. 2008) (stating that "federal courts have refused to toll" the two-year statute of limitations contained in Section 3 of the RLA because the statute "should be literally applied in the absence of a clear showing of a contrary or qualified intention of Congress" and "a court is not justified in finding any exception to, or extension of, this period.") (internal citations and quotations omitted); *Lekas v. United Airlines, Inc.*, 282 F.3d 296, 301 (4th Cir. 2002); *Woodruff v. AMTRAK*, 2009 U.S. Dist. LEXIS 119006, *4-9 (S.D.N.Y. Dec. 21, 2009); *Marshall v. Grand Trunk W.*, 1984 U.S. App. LEXIS 14398, *3-5 (6th Cir. 1984).  In fact, the two cases from this jurisdiction that are cited by the Plaintiffs to support equitable tolling in RLA cases do not even deal with a statute of limitations period contained in the RLA.  *See Woodruff*, 2009 U.S. Dist. LEXIS 119006, at *4-9 (failure to bring a discrimination claim within the statutory period required by the Americans with Disabilities Act); *Marshall*, 1984 U.S. App. LEXIS 14398, at *3-6 (failure to bring a claim within the statute of limitations period required by the Federal Employers' Liability Act).

Plaintiffs here, the employees in *Catalano* cited to the "general equity principles governing the accrual of actions" espoused in *Holmberg*. *Id*. at 370-71. But the court in *Catalano* rejected this argument, and instead focused on the language of the RLA, stating that such "general principles must be subordinated to the congressional intent expressed in the language of the statutes governing arbitration procedures. It is evidence that in enacting these provisions then Congress sought to ensure the speedy and conclusive settlement of disputes submitted to arbitration." *Id*. Due to the "underlying congressional concern with speed and finality" and the clear statutory language of the RLA, the *Catalano* court held the 10-day statute of limitations period was absolute and ran from the date of filing of the award. *Id*.; *see also* 45 U.S.C. § 159, Second (stating that "[a]n award . . . *shall be conclusive* on the parties . . . unless, within ten days after the filing of the award, a petition to impeach the award . . . shall be filed . . . .") (emphasis added).

But even if equitable tolling were applicable to the statute of limitations for interest arbitrations under the RLA, the Plaintiffs' action would still be untimely because they have not established a basis for tolling that would bring them within the 10-day period. "Because statutes of limitations protect important social interest in certainty, accuracy, and repose, . . . equitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances." *A.Q.C. v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (internal citations and quotations omitted). "[C]ourts do not apply [equitable tolling's] requirements mechanically. . . . Rather, the exercise of a court's equity powers must be made on a case-by-case basis, mindful that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011) (internal citations and quotations omitted). Thus, the doctrine is discretionary and requires the Court to examine the

21

facts and circumstances of each case so as to fashion the most appropriate relief.  *See Kassman v. KPMG LLP*, 2015 U.S. Dist. LEXIS 118542, at *19-20 (S.D.N.Y. Sep. 4, 2015).  "The burden of demonstrating the appropriateness of equitable tolling [] lies with the plaintiff."  *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).

A party is entitled to equitable tolling of a statute of limitations only when "extraordinary circumstances prevented a party from timely performing a required act, and that the party acted with reasonable diligence throughout the period he [sought] to toll."  *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal citations and quotations omitted); *see also Menominee Indian Tribe v. United States*, 136 S. Ct. 750, 755 (2016) (tolling applies "only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.").  "The first test, which requires extraordinary circumstances, stems from the fact that equitable tolling undermines to some extent the interests served by statutes of limitations."  *Kassman*, 2015 U.S. Dist. LEXIS 118542, at *10.  Courts have held that "[i]n order for 'extraordinary circumstances' to have prevented [a plaintiff] from timely filing [a] complaint, the information [ ] sought . . . must have been necessary for that complaint to have been legally sufficient."  *Walker*, 430 F.3d at 564.

"The second test, which requires reasonable diligence, limits this equitable remedy to litigants who have not contributed to the delay that, without equitable tolling, would bar their claims."  *Kassman*, 2015 U.S. Dist. LEXIS 118542, at *10.  The party seeking to toll the statute of limitations must show that they were diligent, and relief will be denied to those claimants "whose own actions contributed to the delay that resulted in the filing of an untimely claim."  *Id.* at *18-19.  In making its determination, a court should examine the cause of the delay.  *See id.*

Relief is proper "if despite all due diligence [plaintiff] is unable to obtain vital information bearing on the existence of his claim." *Valdez v. United States*, 518 F.3d 173, 182 (2d Cir. 2008) (internal citations and quotations omitted). "Courts have applied a reasonable plaintiff test to assess opt-in plaintiffs' knowledge of the facts giving rise to their claims—'whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action, and despite all due diligence he was unable to obtain vital information bearing on the existence of his claim.'" *Kassman*, 2015 U.S. Dist. LEXIS 118542, at * 16 (quoting *Lanzetta v. Florio's Enters., Inc.*, 763 F. Supp. 2d 615, 622 (S.D.N.Y. 2011)).

The Plaintiffs' claim of tolling fails to satisfy the reasonable diligence part of the test. The claims asserted in the Complaint are based on the *ex parte* contacts between Mr. Burdette and Arbitrator Goldberg and the relationship between the two men. *See* Compl. ¶¶ 60-71. According to the Complaint, all contacts between the two took place via email except for an in-person meeting in Chicago that was planned by email. *See* Compl. ¶¶ 47-57. Both sides state that the Plaintiffs received copies of the relevant emails referenced in the Complaint on March 15, 2016, the day that they were produced by American in *Krakowski I*. *See* Email from S. Ackerman to A. Press, dated March 15, 2016 (attached as Ex. 4 to APA Mem. in Supp. of Mot. to Dismiss [ECF No. 14-6]); Hr'g Tr. 44:15-17 (July 31, 2018) (Plaintiffs' counsel stating that "in the threshold elements, there's not a dispute.  I think we agree.  March 15, 2016 is when the documents are produced.").  At the point in time when they received these emails, the Plaintiffs were put on notice regarding the relationship and contacts between Mr. Burdette and Arbitrator Goldberg that form the basis of the Complaint.[19]  While the exact date when the Plaintiffs

---

[19]     The Plaintiffs allude to Mr. Burdette's trip to Chicago and his membership in MREP as facts of which the emails did not provide notice, stating that they had no knowledge of either until Mr. Burdette's deposition.  *See* Pls.' Resp. at 14.  But the Plaintiffs' own Complaint clearly states that the emails discussed both Mr. Burdette's interest

examined the emails is unclear, March 15, 2016 is more than three months prior to the filing of

the Complaint on June 27, 2016.  The Plaintiffs have not demonstrated reasonable diligence to

justify the three month delay in filing, which is well outside of the 10-day statute of limitations in

Section 9, Second of the RLA.  The Court therefore finds the filing of the Complaint was

untimely.[20]

The Plaintiffs argue that, as a procedural matter, the Court should not grant dismissal

based on a statute of limitations defense.  *See* Pls.' Resp. at 13.  But the facts supporting the

statute of limitations defense are set forth in the Complaint, including the date of the arbitration

award and the date of the Complaint itself.  *See* Compl. ¶¶ 43, 45, 54; Compl. at 14; *see also*

*Ellul*, 774 F.3d at 798 n.12 ("Although the statute of limitations is ordinarily an affirmative

defense that must be raised in the answer, a statute of limitations defense may be decided on a

Rule 12(b)(6) motion if the defense appears on the face of the complaint.").  The Complaint also

sets forth in detail the contents of the emails that are the basis for the Plaintiffs' Complaint.  *See*

Compl. ¶¶ 48-50, 52-54.  The only fact not contained in the Complaint is the date when these

emails were produced to the Plaintiffs; this fact is relevant only to the Plaintiffs' tolling

argument, which the Plaintiffs have the burden of establishing.  In any event, while not contained

in the Complaint, the date of the production of the emails is an undisputed fact brought to the

---

in joining MREP and the planning of his trip to Chicago for MREP training, as well as his making a voluntary
contribution to MREP as suggested by their annual report.  Compl. ¶¶ 49, 52-53.

[20]    Courts in this jurisdiction have held that when the statute of limitations is tolled due to the concealment of
facts relating to the claim, "[a]ll that is necessary to cause the [equitable] tolling period to cease is for there to be
reason to suspect the probability of any manner of wrongdoing."  *Zola v. Gordon*, 685 F. Supp. 354, 367 (S.D.N.Y.
1988) (with respect to the fraudulent concealment, stating that "equitable tolling ceases to operate at the time a
person exercising due diligence should have discovered the probability of fraud" and rejecting what the District
Court characterized as the "standard of actual knowledge" argued for by the plaintiff); *see also 131 Main St. Assocs.
v. Manko*, 54 F. App'x 507, 513 (2d Cir. 2002).  "Courts have held that facts that should arouse suspicion . . . are
equated with actual knowledge of the claim.  Thus, a court should look to the time when a significant fact emerges
rather than the time when a particular party realizes he has a claim."  *Wolf v. Wagner Spray Tech Corp.*, 715 F.
Supp. 504, 509 (S.D.N.Y. 1989) (fraudulent concealment exception to statute of limitations) (internal citations and
quotations omitted).

Court's attention in the pleadings of both parties. *See Banks v. Yokemick,* 214 F. Supp. 2d 401, 405 (S.D.N.Y. 2002) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are bidding upon the party making them.") (internal citations and quotations omitted); *Bank of America v. Farley*, 2001 U.S. Dist. LEXIS 21676, at *15-16 (S.D.N.Y. Dec. 28, 2001) (treating initial answer in which defendants admitted signing credit documents as a formal judicial admission); *see also* Pls.' Resp. at 14 n.7 ("American produced the Goldberg/Burdette emails on March 15, 2016 as part of a 2,300 page production."); Email from S. Ackerman to A. Press, dated March 15, 2016 (attached as Ex. 4 to APA Mem. in Supp. of Mot. to Dismiss [ECF No. 14-6]).  Under these circumstances, the Court concludes that it is appropriate to consider the statute of limitations defense now. *See Edwards v. Johnson*, 198 F. Supp.3d 874, 877 (N.D. Ill. 2016) ("Although generally a plaintiff is not required to plead around an affirmative defense, such as a statute of limitations, [a] court can dismiss a complaint as untimely if the plaintiff has admitted all the elements of the affirmative defense.").

The Plaintiffs also argue that the email production did not end the tolling period because "unauthenticated hearsay is not a reasonable basis for a lawsuit."  Pls.' Resp. at 14 n.7.  Instead, the Plaintiffs argue that tolling ran until the date of Mr. Burdette's deposition because "[p]ursuit of this lawsuit required a witness" and "Burdette was the one and only witness who could testify to the emails.  Securing his testimony was thus necessary before Plaintiffs could bring the case, and they did so with reasonable diligence."  *Id.*[21]  But that is not the law.  A party does not need

---

[21]    As previously discussed, the Complaint also alleges *ex parte* contacts between Mr. Reinert and Arbitrator Bloch.  Compl. ¶¶ 58-59.  The Complaint states that Mr. Reinert sent Arbitrator Bloch an email asking Arbitrator Bloch to call him, which Arbitrator Bloch subsequently did. *Id.* ¶ 59.  The Plaintiffs do not address the Bloch-Reinert emails in the context of their tolling argument, possibly because they also received a copy of the Bloch-Reinert email on March 15, 2016 through the *Krakowski I* discovery process.  In any case, there is no explanation as to why Mr. Burdette's deposition would produce any facts relating to the email communications between Arbitrator Bloch and Mr. Reinert and therefore would justify tolling of the statute of limitations with respect to the Bloch/Reinert allegations contained in the Complaint.

to have admissible evidence in hand before they file a complaint.  Federal Rule of Civil Procedure 11 permits the filing of a pleading for which the factual contentions "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(3); *see also Rotella v. Wood*, 528 U.S. 549, 560 (2000).  The Court finds that the information contained in the emails was a sufficient basis for filing the Complaint.  Thus, the Plaintiffs have not met their burden to show the *reasonable* diligence required in this jurisdiction for the tolling of the statute of limitations.  Such a conclusion is consistent with the "underlying congressional concern with speed and finality" upon which the 10-day limitations period of Section 9, Second of the RLA is based.  *Catalano*, 348 F. Supp. at 371.[22]  The Court therefore finds that even if equitable tolling were available for claims under Section 9 of the RLA, this Complaint would still be untimely.

At the hearing on the Defendants' motions to dismiss, the Plaintiffs raised additional arguments for the first time.  For example, they argued that the statute of limitations did not begin to run here because the arbitration award was not filed with a federal district court.  Under Sections 8 and 9 of the RLA, interest arbitration awards generally become final when they are filed with a U.S. district court, and the RLA sets the filing date as the date on which the 10-day statute of limitations period begins to run.  *See* 45 U.S.C. § 158(k)-(l), 45. U.S.C. § 159, Second.

---

[22]    While not explicitly stated in their papers, the Plaintiffs appear to suggest that the 10-day statute of limitations did not provide them with sufficient time to review the 2,300 page production. *See* Pls.' Resp. at 14 n.7; Hr'g Tr. 44:24-45:1 (July 31, 2018).  But the Plaintiffs do not explain how the size of the production alone would constitute the "extraordinary circumstances" required for equitable tolling.  Indeed, one might imagine that the Plaintiffs had reviewed the produced materials by May 13, 2016, the date that they served Mr. Burdette with a subpoena, which was more than a month prior to the filing of the Complaint. *See* Pls.' Resp. at 14 n.7 ("Plaintiffs served Burdette with a subpoena at his Texas home on May 13, 2016, and the deposition was then scheduled at a date mutually agreed upon by Burdette and all counsel.").  In any event, the Plaintiffs have the burden of establishing their reasonable diligence here, and they have failed to do so.  More specifically, they have not established that they acted with reasonable diligence once they received the documents that alerted them to their potential claim.

The Plaintiffs' papers fail to raise any argument about the failure to file the award, either on the basis of the statute of limitations or otherwise. *See* Hr'g Tr. 36:24 (July 31, 2018) (when questioned by the Court as to where the argument was located in their papers, Plaintiff's counsel admitting "[i]t is nowhere in our brief."); *see id.* at 37:9-11. Rather, the Plaintiffs waited until the hearing on the Defendants' motions to dismiss and then raised the issue for the first time. *See* Hr'g Tr. 36:9-42:6 (July 31, 2018). That alone is a basis to reject the argument. "To countenance such action would promote litigation by ambush and, in any case, deprive defendant[s] of a fair opportunity to respond." *White v. First Am. Registry*, 592 F. Supp. 2d 681, 683 (S.D.N.Y. 2009) (refusing to hear arguments that were raised for the first time in reply papers). "In the absence of such a rule, parties would have an incentive to withhold certain claims or defenses until the last moment, lying in wait to spring onto their opponents unanticipated arguments in reply briefs or in the final moments of oral argument. Such an outcome would not only be inefficient, but also manifestly unjust." *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 98-99 (E.D.N.Y. 2010) (stating with respect to argument raised for first time at oral argument that because it "was not raised until this late point, defendant cannot raise it now. . . . ); *see also United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) ("Normally, we will not consider arguments raised for the first time in a reply brief, let alone at or after oral argument."); *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) ("As to [defendant's] second argument . . . this argument was raised for the first time at oral argument and so was waived in terms of this motion.").

In any case, the Plaintiffs' argument on this point fails on the merits. The parties to the LOA 12-05 arbitration agreed in the Protocol Agreement to waive this filing requirement, and provided that the arbitration award would be final and binding upon issuance. *See* Protocol

Agreement §§ 7-8 (incorporating RLA sections, but stating that [n]othing in this Agreement should be construed to require AA or APA to file a copy of the Board's award with a federal district court in order for the award to be final and binding."). The Plaintiffs conceded this at the hearing. *See* Hr'g Tr. 36:14-15, 39:10-12 (July 31, 2018). Indeed, parties to interest arbitrations commonly waive statutory procedural requirements contained in the RLA. *See* APA Mem. in Supp. of Mot. to Dismiss at 13 (citing The Railway Labor Act, Ch. 6.II.E.1 (Chris A. Hollinger, ed., 3rd ed. 2012) ("Often the parties, by agreement, elect not to follow all of the processes of Sections 7, 8, and 9."); *Krieter v. Lufthansa German Airlines, Inc.*, 558 F.2d 966, 968 (9th Cir. 1977) ("Defects in proceedings prior to or during arbitration may be waived by a party's acquiescence in the arbitration with knowledge of the defect."); *United Transp. Union v. Illinois Cent. R.R.*, 998 F. Supp. 874, 887 (N.D. Ill. 1998) (same)).[23]

## CONCLUSION

For the reasons stated above, the Court grants the Defendants' motions to dismiss the Complaint based on lack of standing and lack of timeliness.[24] Due to the lack of subject matter jurisdiction and untimeliness of the Complaint, the Court need not address the Defendants'

---

[23]    The Plaintiffs also asserted at the hearing that the failure to file the award with the district court was a notice issue. *See* Hr'g Tr. 36:16-18, 41:8-12 (July 31, 2018). But the Plaintiffs did not cite to any case law for that proposition and conceded they have no basis to argue they did not know about the award. *See id.* at 41:13-17, 41:23-42:1. At the hearing, the Plaintiffs also made a policy argument that procedural rights under the RLA cannot be contracted away by the union. *See id.* at 38:22-39:2. But the cases cited by the Plaintiffs for this argument are clearly distinguishable as each relates to individual employee rights to submit grievances and participate in the process, not in the interest arbitration context. *See id.* at 38:20-39:2, 40:10-22 (citing *Capraro v. United Parcel Service Co.*, 993 F.2d 328, 336 (3d Cir. 1993); *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 740 n.39 (1945); *Slagley v. Illinois Cent. R. Co.*, 397 F.2d 546, 551 (7th Cir. 1968)).

    At the hearing, the Plaintiffs also asserted that the Defendants have failed to meet their burden on this filing issue because a statute of limitations argument is an affirmative defense and the Defendants are therefore required to make a *prima facie* case. *See* Hr'g Tr. 37:16-23 (July 31, 2018). But the filing requirement was squarely addressed in APA's motion to dismiss, and it was the Plaintiffs who failed to address this issue in their opposition papers. *See* APA Mem. in Supp. of Mot. to Dismiss at 13.

[24]    To the extent that an argument made by the Plaintiffs has not been specifically addressed by the Court in this decision, it is rejected as being insufficient to survive the Defendants' motions to dismiss.

motions with respect to the merits of the Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).

The Defendants should settle an order on three days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel to the Plaintiffs.

Dated: New York, New York
       March 8, 2019


                                        */s/ Sean H. Lane*_____
                                        UNITED STATES BANKRUPTCY JUDGE